**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Pedro ALVAREZ and Jose H. Gutierrez,**
**Defendants–Appellants.**

Nos. 87–1575, 87–1576.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 24, 1987.
Decided Nov. 18, 1987.

A. Luis Ortiz, Indianapolis, Ind., for defendants-appellants.

John J. Thar, U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before BAUER, Chief Judge, KANNE, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

BAUER, Chief Judge.

This is an appeal by two codefendants from their convictions for conspiracy to distribute cocaine and distribution of cocaine. After considering the several challenges of these two defendants, we affirm.

## I.

### *Facts*

Defendants Pedro Alvarez and Jose Gutierrez were arrested on July 10, 1986, along with three other codefendants, Felix Valdivias, Ricardo Rivera, and Marion Rivera. On August 6, 1986, an indictment was returned charging Alvarez and Gutierrez with conspiring with Valdivias, the Riveras, and others to distribute cocaine in violation of 21 U.S.C. § 846. The indictment also charged Alvarez with distributing one ounce of cocaine on April 30 and June 20, 1986, and both Alvarez and Gutierrez with

distributing five ounces of cocaine on July 10, 1986, in violation of 21 U.S.C. § 841(a)(1). On January 5, 1987, a hearing was held on Gutierrez's motion to suppress evidence found during a warrantless search of his van and the motion was denied. Trial began on January 6, 1987, and ended on January 15, 1987; the jury convicted Alvarez and Gutierrez as charged.

### A.

The convictions of Alvarez and Gutierrez resulted from a five-month undercover operation conducted by the FBI. The operation began on March 26, 1986, when FBI Special Agent Johnnie Jackson arranged by telephone, through a confidential informant, to purchase one-eighth ounce of cocaine from Ricardo Rivera. Later that same day, Jackson purchased one-eighth ounce of cocaine from Ricardo and Marion Rivera for $300.00 in official government funds and the parties discussed the possibility of making future purchases. Several other purchases were in fact made by Jackson from the Riveras and others.

On April 30, 1986, for example, Special Agent Jackson again contacted Rivera by phone and arranged to purchase one ounce of cocaine for $1,800.00. As directed by Ricardo Rivera, Jackson and the informant drove to Rivera's residence where they saw Pedro Alvarez and Richard Gray. There Jackson met with Rivera and Valdivias, who stated the price for an ounce of cocaine was $1,800.00 and left to get the cocaine. While Valdivias was gone, Rivera asked Jackson to go into business with him and told Jackson that Alvarez and Valdivias were in the cocaine business with Rivera, each of them having travelled to Miami to bring back cocaine. Rivera also mentioned that Gray, whom he called "Spoonie", was not a partner in the business, but worked as a translator in cocaine transactions at the T & T Lounge at 21st and Illinois Streets, Indianapolis, Indiana. Valdivias returned to Rivera's house and delivered one ounce of cocaine to Jackson in return for $1,800.00 in official government funds.

During the April 30 meeting FBI Special Agent William Blackketter conducted surveillance of the cocaine purchase. Blackketter testified that he saw Alvarez and Valdivias leave Rivera's residence, drive to 3330 North Meridian Street, return, and leave again, driving to 3330 North Meridian Street, where they entered and stayed for approximately thirty minutes before returning to Rivera's house.

Between April 30, 1986, and June 20, 1986, Special Agent Jackson unsuccessfully attempted to purchase cocaine from Marion Rivera, who stated that Ricardo Rivera was in jail and that she could not round up Alvarez and Valdivias. Later, Ricardo Rivera also advised Jackson that because he, Ricardo, had been arrested by the Indianapolis Police Department, Alvarez and Valdivias did not trust him and were staying away from him.

On another occasion, July 3, 1986, Special Agent Jackson drove to Rivera's new house at 2030 Caroline, Indianapolis, Indiana, where Ricardo Rivera and Alvarez accused Jackson of shorting them $100.00 on a cocaine purchase of June 20, 1986. Alvarez acknowledged he was present when Rivera counted the money, but admitted the cocaine sold to Jackson on June 24, 1986, was weak. The three men discussed a new sale of three to five ounces and Jackson wrote out on a piece of paper the prices of one ounce to five ounces, and handed the paper to Alvarez. Alvarez said he could probably sell five ounces for $9,000.00, but he could not guarantee it. When their conversation ended, Alvarez left, driving the same black van Jackson had been instructed to park behind when he made the earlier cocaine purchase on June 20, 1986.

On July 10, 1986, Special Agent Jackson telephoned Ricardo Rivera and then drove to his house with the informant. Alvarez and Rivera got into Special Agent Jackson's car and Alvarez said he was going to go buy the cocaine and that Valdivias had the cocaine. Fifteen to twenty minutes after Alvarez left, he returned and then left in his red Camaro. After three to five minutes, Jackson saw the red Camaro, driven by Valdivias, return and park across the street in front of Ricardo Rivera's residence. Alvarez returned as a passenger in a different black van, which parked behind Jackson's vehicle. Valdivias got out of the red Camaro, walked empty-handed to the passenger side of the black van where Alvarez was seated, received a package which he then gave to Ricardo Rivera and Ricardo handed it to Jackson. Jackson took the package of cocaine, walked to the trunk of his car and obtained a gym bag. He then gave Rivera $9,000.00 in official government funds as payment and placed the cocaine and remaining $1,000.00 along with the paper towel in which the cocaine had been wrapped into his gym bag. FBI agents arrived and placed Ricardo Rivera and others under arrest. Special Agent Yarborough arrested Special Agent Jackson and took custody of Jackson's gym bag containing the cocaine, paper towel and $1,000.00, along with the $9,000.00 which Rivera had stuffed into the backseat of Jackson's car. Jackson pointed out the hispanic male who had driven the black van to Special Agent Weiss, who placed that individual under arrest. Special Agents Yarborough and Weiss identified the driver of the black van as the defendant Jose Gutierrez.

Gutierrez was also arrested and his van seized for forfeiture purposes. At this point, the agents conducted a cursory search for weapons at the scene. On July 15, 1986, the government conducted an inventory search of Gutierrez's van but did not discover any contraband. Prior to the inventory search, the government released Gutierrez from custody and dismissed the charges against him. Gutierrez requested the release of his van on several occasions but the FBI refused. Based on these inquiries by Gutierrez and information the FBI received from a confidential source indicating the agents had missed something during their earlier search, the FBI conducted another search of the van on August 1, 1986. The agents discovered one gram of cocaine buried in the passenger's seat of the van. The agents did not obtain a warrant to search Gutierrez's van on August 1.

### B.

On appeal, Alvarez and Gutierrez raise several objections to the proceedings below. Alvarez claims that the trial judge improperly admitted evidence of a prior conviction and that the record does not provide sufficient evidence that Alvarez was involved in a conspiracy or possessed cocaine with intent to distribute. Gutierrez argues that the warrantless search of his van on August 1 was illegal; that the trial judge erred in allowing the government to cross-examine a witness beyond the scope of the direct examination; that the testimony of another witness should have been excluded because it was beyond the scope of the conspiracy; and that there is insufficient evidence of his involvement in any conspiracy or possession of cocaine with intent to distribute. We shall deal with each of these issues in order.

### II.

*Alvarez's Conviction*

#### A. Prior Conviction

Alvarez asserts that the trial judge erroneously permitted his impeachment with a prior conviction for possession of cocaine pursuant to Rule 609 of the FEDERAL RULES OF EVIDENCE. The government prosecutor, out of the presence of the jury, told the trial judge that he intended to use a 1985 conviction of Alvarez for possession of cocaine for impeachment purposes. The trial judge held a hearing on the matter. Counsel for Alvarez objected to the use of the certified copies of the prior conviction but conceded that the prior conviction could be used for impeachment purposes. The prosecutor explained that the evidence would only be used for impeachment purposes and that there would be no discussion of the underlying facts. During this hearing, the trial judge read and discussed Rule 609 with the parties. After the prior conviction was introduced, the trial judge carefully instructed the jury that this information could be considered only in regards to the defendant's credibility, but could not be considered as evidence of guilt.

■ Rule 609 allows for the admission of some prior convictions for the limited purpose of impeachment if "the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant...." FEDERAL RULES OF EVIDENCE 609. Alvarez reads this court's opinion in *United States v. Mahone*, 537 F.2d 922 (7th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976), to require an *explicit* determination on the record that the probative value of a prior conviction outweighs its prejudicial effect to the defendant. In fact, although the court in *Mahone* recommended explicit findings on Rule 609 determinations, it held that the trial judge did not abuse his discretion by implicitly balancing the probative value with the prejudicial effect of the testimony. *Id.* at 928–29.

As in *Mahone*, the trial judge here conducted a hearing and discussed with the parties Rule 609 and its application to the evidence at issue. The judge asked the prosecutor to define the purpose and limitations on the use of the evidence and the prosecutor presented the judge with a certified copy of the conviction. Throughout, the trial judge provided Alvarez's counsel the opportunity to rebut the government's presentation and to point out the potential prejudicial effect of the use of the prior conviction. Finally, immediately upon admission of the prior conviction for impeachment, the trial judge cautioned the jury not to use this evidence to determine the defendant's guilt or innocence. Under *Mahone*, the absence of an explicit finding is not necessarily reversible error. Viewed in totality, we cannot say that the trial judge abused his discretion by allowing the government to impeach Alvarez with his prior conviction. *See also United States v. Byrd*, 771 F.2d 215, 219–20 (7th Cir.1985). In so ruling, however, we reiterate our view expressed in *Mahone* that trial judges should strive to make explicit their findings on Rule 609 so that the court on appeal can more readily determine whether the judge followed the requirements of Rule 609. *Mahone*, 537 F.2d at 929.

## B. Sufficiency of the Evidence

Alvarez also attacks the sufficiency of the evidence to support his conviction. In reviewing the record as a whole, we must uphold the jury's verdict if, after viewing the evidence in a light most favorable to the government, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Gabriel,* 810 F.2d 627, 633 (7th Cir.1987); *United States v. Liefer,* 778 F.2d 1236, 1249 (7th Cir.1985). Circumstantial evidence may be sufficient to support a conviction. *United States ex rel. Green v. Greer,* 667 F.2d 585, 587 n. 3 (7th Cir.1981).

■ Alvarez contends that because there is no direct evidence that he exchanged money or cocaine with Special Agent Jackson, or that Alvarez and Jackson ever spoke to each other directly, there is insufficient evidence to support his conviction. Once a conspiracy is shown to exist, however, "evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict." *United States v. Perlaza,* 818 F.2d 1354, 1359 (7th Cir.1987) (quoting *United States v. Xheka,* 704 F.2d 974, 988 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983)). Under a conspiracy charge, 21 U.S.C. § 846 only requires evidence of an agreement; overt acts need not be alleged. *United States v. Sweeney,* 688 F.2d 1131, 1140 (7th Cir.1982); *United States v. Mayo,* 721 F.2d 1084, 1089 (7th Cir.1983). The agreement needed for a conspiracy conviction may be proven by circumstantial evidence. *United States v. Shelton,* 669 F.2d 446, 451 (7th Cir.1982), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982); *United States v. Dalzotto,* 603 F.2d 642, 645 (7th Cir.), *cert. denied,* 440 U.S. 494, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979). "Even without personal communication, tacit understanding of the usual business arrangements through a long course of conduct between the parties is enough to constitute an agreement." *United States v. Reynolds,* 801 F.2d 952, 954 (7th Cir.1986) (citations omitted).

■ Alvarez's involvement in the drug sales to Special Agent Jackson were well documented at trial. On April 30, 1986, Alvarez drove Valdivias to Alvarez's residence to pick-up the cocaine and deliver it to Jackson at Ricardo Rivera's residence. On June 20, 1986, Jackson again purchased cocaine at Alvarez's residence while Alvarez was present. In addition to the facts outlined above, Marion Rivera and Richard Grey testified pursuant to a plea agreement with the government concerning Alvarez's detailed involvement in the cocaine distribution business with Ricardo Rivera and Valdivias. Based on these facts and other evidence on the record, we conclude that there was sufficient evidence presented to the jury to support the conviction of Alvarez.

## III.

### *Gutierrez's Conviction*

#### A. Van Search

■ Gutierrez challenges the warrantless search of his van on August 1, 1986, in which the government found incriminating contraband. Gutierrez does not argue that the government agents violated his rights in seizing the van pursuant to the federal forfeiture statute. 21 U.S.C. § 881. At oral argument, Gutierrez's counsel also conceded that the case law holds that once a vehicle is validly seized for forfeiture, it can be searched at will, without a warrant. *United States v. Johnson,* 572 F.2d 227 (9th Cir.), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1137 (1978); *United States v. Edge,* 444 F.2d 1372 (7th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 101, 30 L.Ed.2d 97 (1971). Gutierrez, however, asks this court to modify this rule to allow for the release of the van once the government receives additional information removing the probable cause that the vehicle was used for illegal purposes and the defendant requests release of the van.

We need not address this issue because it does not accurately describe the facts of

this case. Probable cause that Gutierrez's van was used for illegal activity never disappeared. In fact, the additional evidence received by the FBI agents aroused their suspicions rather than extinguished them. Gutierrez erroneously equates the dismissal of charges against him with the absence of probable cause to retain the van. These are not the same. Although the government may have felt it lacked sufficient evidence to convict Gutierrez immediately after his arrest, this did not affect the government's probable cause to believe the van was used for illegal purposes. Only if there were no longer probable cause to retain the van would there be reason for the government to release it. In this case, however, the probable cause for seizure, forfeiture, and the search of the van were developed independently and unaffected by the release of Gutierrez. Moreover, the warrantless search was closely related to the reason why the van was seized and retained: the possession and distribution of cocaine. *Edge,* 444 F.2d at 1375 (footnote omitted). The rule of *Johnson* and its progeny, therefore, permit the warrantless search of the van.

## B. Dupee's Testimony

■ Gutierrez next contends that the trial judge improperly allowed the government to exceed the scope of direct examination when it cross-examined a defense witness, Sheila Dupee. After the government had rested, Gutierrez's codefendant, Alvarez, called Dupee as his second witness. Dupee did not testify at all regarding Gutierrez nor was she asked any questions by or on behalf of Gutierrez. Over the strenuous objection of Gutierrez's counsel, the trial judge allowed Dupee to testify on cross-examination by the government regarding certain incriminating statements made to her by Gutierrez.

Rule 611(b) of the FEDERAL RULES OF EVIDENCE limits cross-examination to the subject matter of direct examination. The rule also allows the trial judge to use its discretion in permitting cross-examination to exceed this boundary. "The 'management of cross-examination is peculiarly committed to the district court's discre-

tion,'" *United States v. Castro,* 788 F.2d 1240, 1244 (7th Cir.1986) (quoting *United States v. Silva,* 781 F.2d 106, 110 (7th Cir.1986) [quoting *United States v. Murphy,* 768 F.2d 1518, 1536 (7th Cir.1985) ] ). We do not believe the trial judge in this instance abused his discretion.

As Gutierrez concedes, Dupee could have been asked the same questions as a rebuttal witness. Gutierrez also had the opportunity to cross-examine Dupee and to rebut her testimony. Gutierrez did in fact challenge Dupee's testimony when he testified later that Dupee was lying. We conclude, therefore, that the trial court's rulings on the order of proof and the government's tactics did not amount to an abuse of discretion by the trial judge.

## C. Gray's Testimony

■ Gutierrez's third objection to his conviction stems from the admission of the testimony of Ricardo Gray a/k/a "Spoon". Gutierrez argues that this testimony should not have been allowed because it was beyond the scope of the conspiracy. Gray testified to numerous drug transactions involving Gutierrez and other defendants. This testimony was relevant to the charge of conspiracy contained in the indictment. Gray's testimony described the drug-related activities of Gutierrez and several other defendants at the T & T Lounge, a location that was the scene of some of their business transactions. The events to which Gray testified were closely linked to the other overt acts involved in the conspiracy.

Gutierrez argues that Gray's testimony is irrelevant because it refers only to a multiple conspiracy theory. This argument, however, mischaracterizes the nature of the government's case. The government alleges, and the evidence shows, a single conspiracy. Gray's testimony fits within the scope of the alleged single conspiracy.

The fact that many overt acts occurred over an extended period of time does not necessarily turn a single conspiracy into a multiple conspiracy. The focus should be

on "what the defendants agreed to when they decided to distribute cocaine." *United States v. Percival,* 756 F.2d 600, 607 (7th Cir.1985). "If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy." *Id.* (quoting from *United States v. Varelli,* 407 F.2d 735, 742 (7th Cir.1969)). This agreement can be inferred from the circumstances. *Id.* The evidence shows that all of the defendants worked together, in varying degrees, to distribute cocaine. They all knew each other, spoke with each other, and sometimes accompanied one another on drug related business. We find that there was sufficient evidence of an interdependent and mutual relationship to support a finding of a single conspiracy to distribute cocaine and Gray's testimony was within the scope of this conspiracy.

### D. Sufficiency of the Evidence

 Gutierrez finally argues that there is insufficient evidence to support his conviction for conspiracy and distribution of cocaine. As we noted above, we will affirm the trial court "unless the evidence, viewed in the light most favorable to the government, could not have persuaded any rational trier of fact of defendant's guilt beyond a reasonable doubt." *United States v. Mayo,* 721 F.2d 1084, 1087 (7th Cir.1983). Having already upheld the validity of the government's search of Gutierrez's van, and the admission of Dupee's and Gray's testimony, there can be no doubt that there was sufficient evidence to support a conviction.

Gutierrez's main defense is that he was an unaware innocent bystander in the wrong place at the wrong time. The record fails to support this claim. Although presence alone may not sustain a conviction for conspiracy, "it may nonetheless make participation ... 'more likely than not.'" *United States v. Dalzotto,* 603 F.2d at 645. Moreover, once a conspiracy is shown, even a slight connection between the defendant and conspiracy may support a conviction. *Perlaza,* 818 F.2d at 1359.

Testimony in the trial indicated that Gutierrez had delivered cocaine to Valdivias on at least two occasions and to Ricardo Rivera's residence on another. Gutierrez was also implicated in the sale of cocaine at the T & T lounge along with Valdivias, Rivera, and Alvarez. Cocaine was also found beneath the passenger's seat in Gutierrez's van. Finally, Gutierrez was the driver of the van from which five ounces of cocaine were delivered to Jackson. We conclude that this evidence is sufficient to support the jury's verdict.

For the foregoing reasons, we affirm the convictions of the defendants Alvarez and Gutierrez.